# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Jul 20 2015, 8:53 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Thomas G. Krochta
Vanderburgh County Public Defender
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of E.B., Mother, C.T., Father, and K.B., Child,

C.T.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

July 20, 2015

Court of Appeals Case No. 82A01-1412-JT-525

Appeal from the Vanderburgh Superior Court

The Honorable Brett J. Niemeier, Judge
The Honorable Renee Allen Ferguson, Magistrate

Cause No. 82D01-1407-JT-80

**Kirsch, Judge.**

[1] C.T. ("Father") appeals the juvenile court's order terminating his parental rights to his child, K.B. He raises the following restated issue on appeal: whether sufficient evidence was presented to support the termination of Father's parental rights.

[2] We affirm.

## Facts and Procedural History

[3] On September 10, 2013, K.B. ("Child") was born to E.B. ("Mother").[1] The next day, the Indiana Department of Child Services ("DCS") became involved with Child after his meconium tested positive for THC after birth. Child was initially left in the care of Mother, but was removed from her care on October 3, 2013 due to Mother's instability, lack of housing and income, continued drug use, and inability to provide for Child. DCS filed a Child in Need of Services ("CHINS") petition on the same date. At that time, the CHINS petition named Father as an alleged father to Child. Mother stipulated to the allegations in the CHINS petition, and the juvenile court adjudicated Child to be a CHINS.

[4] At the beginning of the CHINS case, DCS Family Case Manager Hilary Bemis ("FCM Bemis") searched for Father on databases and asked family members about Father's whereabouts, but was unable to locate him. Father was served by publication regarding the CHINS initial hearing. Father failed to appear for

---

[1] E.B. voluntarily relinquished her parental rights. We, therefore, only recite facts pertaining to her as they relate to Father's case.

his initial hearing on the CHINS petition, and the juvenile court defaulted him on the CHINS petition and reaffirmed the CHINS adjudication. Due to Father's lack of participation in the CHINS case, DCS filed a petition to terminate his parental rights on July 18, 2014.

[5] On August 6, 2014, FCM Bemis discovered Father's name on the Department of Correction website when she was preparing for the termination hearing. On the same date, FCM Bemis contacted the prison in which Father was incarcerated and set up a phone conference with him for August 11, 2014. When FCM Bemis spoke with Father, he informed her that he knew about Child's removal and that he had seen Child a couple of times before he became incarcerated in May 2013. A termination hearing was held on September 29, 2014, and Father appeared by telephone and presented evidence.

[6] During the hearing, the following testimony and evidence was presented. Father testified that he had not contacted DCS because, prior to being incarcerated, he had taken Mother to a facility to visit Child, and a woman there told Father not to contact DCS. Father could not remember the name of this woman. FCM Bemis testified that she did know the identity of this woman. At the hearing, Father stated he did not recognize FCM Bemis's name and did not remember speaking to her.

[7] On the date of the hearing, Father was incarcerated at Putnamville Correctional Facility and serving a three-year sentence for Class D felony convictions for possession of methamphetamine and possession of a controlled substance. His

earliest possible release date was set for February 7, 2017. Father's criminal history in Indiana included convictions for: (1) Class D felony obtaining a controlled substance by fraud or deceit on March 1, 2002, which resulted in a one-year sentence; (2) Class D felony theft on April 5, 2007, which resulted in an eighteen-month suspended sentence; (3) Class A misdemeanor conversion on August 14, 2008, which resulted in one year of probation; (4) Class A misdemeanor possession of paraphernalia on June 18, 2013, which resulted in a one-year suspended sentence to a drug abuse probation services program. On October 11, 2013, a petition to revoke probation was filed in regards to this last conviction, and a warrant was issued. Father was released from custody on December 19, 2014 and ordered to be placed on ABK Tracking. On April 30, 2014, Father's probation was again revoked. Father had also been convicted of forgery in Kentucky on June 23, 2008 and sentenced to five years of probation.

[8] Father's incarceration at the time of the termination hearing was due to his addiction to methamphetamine. Prior to being incarcerated, Father testified that he had been using drugs for about a year and a half; however, he did have a drug conviction from 2002. While incarcerated, Father was participating in the Clean Lifestyle is Freedom Forever ("CLIFF") therapeutic community treatment program, which is a nine-month program. Father testified that he was set to graduate from the program on March 9, 2015 and that his sentence would be modified at that time. At the time of the hearing, Father was on the second level of the four-level program. Father also stated that he had attended

substance abuse treatment programs at two locations prior to his incarceration, but had no proof of this treatment.

[9] When the hearing was held, Child had been removed from the home since October 3, 2013, which was before he was even one month old. Father had only seen Child three times. Father testified that he learned that Child was born about a month and a half after Child's birth, but did not take any steps to establish paternity. At the time of the hearing, Child was in a pre-adoptive home and was happy and bonded to the foster parents. DCS's plan was for Child to be adopted by his foster parents. Both FCM Bemis and the Court Appointed Special Advocate ("CASA") recommended the termination of Father's parental rights. FCM Bemis recommended termination because Father did not take any steps to establish paternity or to be involved in Child's life and because he knew about Child's removal and never contacted DCS. *Tr.* at 72. FCM Bemis also stated that Child needed permanency as soon as possible and not to wait until Father's release from incarceration. *Id*. at 73.

[10] On November 18, 2014, the juvenile court issued its findings of fact, conclusions thereon, and order terminating Father's parental rights. Father now appeals.

## Discussion and Decision

[11] We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. When

reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re B.J.*, 879 N.E.2d at 14.

[12] Here, in terminating Father's parental rights to Child, the juvenile court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[13] The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution. *In re C.G.*, 954 N.E.2d 910, 923 (Ind. 2011). These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *In re J.C.*, 994

N.E.2d 278, 283 (Ind. Ct. App. 2013). In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.*

[14] Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

[15] Father argues that DCS failed to prove the required elements for termination by sufficient evidence. Specifically, Father contends that DCS failed to present

sufficient evidence that the conditions that resulted in Child being removed would not be remedied. Father also argues that DCS failed to present sufficient evidence that the continuation of the parent-child relationship posed a threat to Child. He further alleges that DCS failed to present sufficient evidence that termination of his parental rights was in the best interests of Child. Father asserts that he deserved an opportunity to show that he can do better and to reunite with Child. He anticipates successfully completing the CLIFF program and being released early from incarceration and contends that he should be given the opportunity to demonstrate his continued rehabilitation.

[16] In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home would be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, "we must ascertain what conditions led to their placement and retention in foster care." *Id*. Second, "we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id*. (citing *In re I.A.,* 934 N.E.2d 1132, 1134 (Ind. 2010) (citing *In re A.A.C.,* 682 N.E.2d 542, 544 (Ind. Ct. App. 1997))). In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against " 'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K.,* 989 N.E.2d at 1231). "We entrust that delicate balance to the trial court, which has

discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *Id*. Although trial courts are required to give due regard to changed conditions, this does not preclude them from finding that parents' past behavior is the best predictor of their future behavior. *Id*.

[17] Here, the evidence showed that, in October 2013, Child was removed from Mother's care due to her instability, lack of housing or income, continued drug use, and inability to provide for Child. At the time of Child's removal, Father was not involved in Child's life, and DCS was not able to locate him. Child's placement outside the home continued because Mother voluntarily relinquished her parental rights, Father failed to contact DCS when he learned of Child's removal, and Father was incarcerated when DCS was finally able to locate him. Father's argument that he has remedied the conditions that resulted in Child's removal and should be given an opportunity to reunite with Child is based on the fact that he may be released early from prison after completing the CLIFF program. However, at the time of the termination hearing, Father was still incarcerated and had only completed one level of the four-level CLIFF program, and it was not guaranteed that Father's sentence would be modified after his completion of the program. Father's future plans are not evidence on which the juvenile court could base its determination because it must judge a parent's fitness at the time of the termination proceeding. *In re E.M.*, 4 N.E.3d at 643. At the time of the hearing, Father had yet to complete the CLIFF program, and his projected release date was still February 2017.

[18] Additionally, the evidence showed that Father had a criminal history that began in 2002 and continued up to the time of the hearing and that he had a history of substance abuse. Although Father stated he knew about Child's removal from Mother's care, he did not contact DCS and made no effort to be a part of Child's life. Father did not participate in the CHINS case due to DCS's inability to locate him, and when DCS was finally able to locate Father on August 6, 2014, it had been almost one year since Child had been removed. Father's failure to contact DCS and to participate in the case illustrate his lack of concern about Child's welfare. Based on the evidence presented, we conclude that the juvenile court did not err in finding that there was a reasonable probability that the conditions that resulted in the removal and the reasons for continued placement of Child outside the home would not be remedied.

[19] Father also contends that DCS failed to prove by clear and convincing evidence that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to the well-being of Child. However, we need not address such argument. Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S.*, 987 N.E.2d at 1156. Therefore, as we have already determined that sufficient evidence supported the conclusion that the conditions that resulted in the removal of Child would not be remedied, we will not address any argument as to whether sufficient

evidence supported the conclusion that the continuation of the parent-child relationship posed a threat to the well-being of Child.

[20] Father next argues that insufficient evidence was presented to prove that termination is in the best interest of Child. In determining what is in the best interests of the child, the trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010) (citing *In re D.D.,* 804 N.E.2d at 267), *trans. dismissed.* In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. *Id*. (citing *In re R.S.,* 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*). The trial court need not wait until the child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests. *Id*. (citing *McBride v. Monroe Cnty. Office of Family & Children,* 798 N.E.2d 185, 203 (Ind. Ct. App. 2003)).

[21] In the present case, at the time of the termination hearing, Father still had approximately two and a half years left of his prison sentence and was not projected for release until February 2017. He had not yet participated in any services through DCS and would need to do so before DCS and the juvenile court could determine whether he could properly care for Child. Child should

not have to wait over two and a half years for such a determination to be made. "Permanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d at 1265. Child had been removed since before he was one month old. The evidence showed that Child was happy and well bonded to his foster parents who planned to adopt him. Father had only seen Child three times. Additionally, both FCM Bemis and the CASA recommended that Father's parental rights be terminated. FCM Bemis also stated that Child needed permanency "as soon as possible" and should not have to wait until Father is released from prison. *Tr.* at 73. Based on the above, we conclude that sufficient evidence was presented to prove that termination was in the best interest of Child.

[22] We will reverse a termination of parental rights "only upon a showing of 'clear error'--that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *In re Egly*, 592 N.E.2d 1232, 1235 (Ind. 1992)). Based on the record before us, we cannot say that the juvenile court's termination of Father's parental rights to Child was clearly erroneous. We therefore affirm the juvenile court's judgment.

[23] Affirmed.

Vaidik, C.J., and Bradford, J., concur.